**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Quanta Indemnity Company, | No. CV-11-01807-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Amberwood Development Incorporated, Roll Tide LLP, Summerset Marketing Enterprises Incorporated, North American Specialty Insurance Company, General Fidelity Insurance Company, Winston Casas LLC, | |
| Defendants. | |
| General Fidelity Insurance Company, | |
| Cross-claimant, | |
| v. | |
| Amberwood Homes LLC, Winston Casas LLC, Roll Tide LLP, Summerset Marketing Enterprises Incorporated, Amberwood Development Incorporated, North American Specialty Insurance Company, | |
| Cross-defendants. | |
| General Fidelity Insurance Company, | |
| Counter-claimant, | |
| v. | |
| Quanta Indemnity Company, | |

Counter-defendant.

North American Specialty Insurance Company,

Cross-claimant,

v.

General Fidelity Insurance Company,

Cross-defendant.

Pending before the Court are Plaintiff Quanta Indemnity Company's Motion for Summary Judgment (Doc. 138), Defendant General Fidelity Insurance Company's Motion for Summary Judgment (Doc. 139), and Defendant North American Specialty Insurance Company's Motion for Summary Judgment (Doc. 141). The Court now rules on the motions.

## I.      Introduction

Quanta Indemnity Company ("Quanta") filed this insurance coverage action seeking a declaration that it is not liable under the terms of a commercial general liability policy which it issued to insureds Amberwood Development, Inc.; Amberwood Homes, LLC; Roll Tide LLP; Summerset Marketing Enterprises, Inc.; and Winston Casas LLC (related entities to which the Court collectively refers as "Amberwood"). (Doc. 15). Although this action is an insurance coverage dispute, the dispute is primarily between Quanta and two other insurers of Amberwood, General Fidelity Insurance Company ("GFIC") and North American Specialty Insurance Company ("NAS"). Quanta, GFIC, and NAS each issued commercial general liability policies to Amberwood with nearly identical terms. Nevertheless, when Amberwood was sued in five separate lawsuits, Quanta, GFIC, and NAS took different positions with respect to coverage. *See, e.g.*, (Doc. 140-10 at 49; Doc. 142-1 at 14; Doc. 142-4 at 2).

All three insurers claim against the others for declaratory relief, (Doc. 26; Doc.

37), and NAS seeks equitable contribution from Quanta and GFIC for amounts allegedly expended in defending and indemnifying Amberwood, (Doc. 37 at 14).

**II.     Legal Standard**

    **A.     Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment

context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

Finally, when multiple parties submit cross-motions for summary judgment, the Court considers each motion on its own merits but must consider all of the evidence presented in determining whether a genuine issue of material fact exists. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### B.   Evidentiary Objections

The Ninth Circuit Court of Appeals ("Ninth Circuit") applies a double standard to the admissibility requirement for evidence at the summary judgment stage. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 (3d. ed. 1998).

With respect to the non-movant's evidence offered in opposition to a motion for summary judgment, the Ninth Circuit has stated that the proper inquiry is not "the admissibility of the evidence's form" but rather whether the *contents* of the evidence are admissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Celotex*, 477 U.S. at 324 ("We do not mean that the *nonmoving party* must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." (emphasis added)). Accordingly, the Ninth Circuit has held, albeit sometimes implicitly, that a non-movant's hearsay evidence may establish a genuine issue of material fact precluding a grant of summary judgment. *See Fraser*, 342 F.3d at 1036-37; *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). *But see Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779 (9th Cir. 2002). Thus, "[m]aterial in a form not admissible in evidence may be used to *avoid*, but not to *obtain* summary judgment, except where an opponent bearing a burden of proof has failed to satisfy it when challenged after completion of relevant discovery." *Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993).

The Ninth Circuit has required, however, that evidence offered in support of a motion for summary judgment be admissible both in form and in content. *See Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976). Accordingly, unauthenticated documents cannot be considered in ruling on a motion for summary judgment because authentication is a "condition precedent to admissibility." *Orr*, 285 F.3d at 773; *see also Canada*, 831 F.2d at 925 ("[D]ocuments which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment."). A document authenticated through personal knowledge must be supported with an affidavit "[setting] out facts that would be admissible in evidence" and "show[ing] that the affiant or declarant is competent to testify on the matters stated."[1] Fed. R. Civ. P. 56(c)(4).

Similarly, evidence containing hearsay statements is admissible only if offered in opposition to the motion. "Because '[v]erdicts cannot rest on inadmissible evidence' and a grant of summary judgment is a determination on the merits of the case, it follows that the *moving* party's affidavits must be free from hearsay." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).

However, unlike objections to foundation and hearsay, objections that evidence is not relevant or is misleading are superfluous at the summary judgment stage. These objections are "duplicative of the summary judgment standard itself" because the Court necessarily considers only relevant evidence in its ruling, *see Burch*, 433 F. Supp. 2d at 1119, and because Federal Rule of Evidence 403 provides for the exclusion of evidence that may "mislead the *jury*," not the Court, *see* Fed. R. Evid. 403 (emphasis added); *see also Bafford v. Travelers Cas. Ins. Co. of Am.*, 2012 WL 5465851, at *8 (E.D. Cal. Nov. 8, 2012).

---

[1] A party may comply with the affidavit requirement by offering a declaration complying with 28 U.S.C. § 1746. Evidence may also be authenticated by other means other than personal knowledge, such as any of the approaches enumerated in Federal Rule of Evidence 901. *See Orr*, 285 F.3d at 774.

### C.    Interpretation of Insurance Policies

Under Arizona law, insurance policies, as contracts between insurers and insureds, are construed "to effectuate the parties' intent." *Liberty Ins. Underwriters, Inc. v. Weitz Co., LLC*, 158 P.3d 209, 212 ¶ 8 (Ariz. Ct. App. 2007). "Insurance policy provisions must be read as a whole, giving meaning to all terms. If the contractual language is clear, [the Court] will afford it its plain and ordinary meaning and apply it as written." *Id.* (citation omitted). "[T]he insurer bears the burden to establish the applicability of any exclusion." *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 ¶ 13 (Ariz. Ct. App. 2000).

## III.   Background

The basic facts of the insurance policies and underlying lawsuits giving rise to this case are not in dispute.

### A.    Policies

#### 1.    Quanta

Quanta issued to Amberwood a commercial general liability policy (the "Quanta Policy") for the period March 15, 2005 through March 15, 2006.[2] (Doc. 140-1 at 2). The Quanta Policy provided coverage, in part, for "property damage" caused by an "occurrence," and defined property damage, in part, as "[p]hysical injury to tangible property." (*Id.* at 23, 36). The Quanta Policy also contained a "limited subsidence exclusion" (the "Limited Subsidence Exclusion"). (*Id.* at 58). Specifically, this exclusion provided:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of any claim or "suit" caused directly or indirectly, based on or attributed to, arising out of, resulting from, or in any manner related to "land or soils movement", if such "land or soils movement" directly or indirectly emanates from, arises out of, is attributable to, any operations by or performed on behalf of the insured prior to the inception date of this policy. Such claims for loss are excluded regardless of any other cause or event contributing concurrently or in any sequence or manner to the loss including, but not limited to the

---

[2] Policy number QAG003659-00. (Doc. 140-1 at 2).

following causes:

*        *        *

6.  Faulty, inadequate or defective:

    a.  Planning, zoning, development, surveying, siting;

    b.  Design specifications, workmanship, repair, constructions, renovations, remodeling, grading, compactions;

    c.  Materials used in repair, construction, renovation or remodeling; or

    d.  Maintenance of part or all of any property wherever located.

For purposes of this endorsement only, SECTION V – DEFINITIONS is amended to include the following:

"Land or soils movement" means all earth or soil movement of any kind including the settling, bulging, shrinkage, expansion, slippage, or subsidence of land or soils.

All other terms and conditions remain unchanged.

(*Id.*)

## 2.   GFIC

GFIC issued to Amberwood a commercial general liability policy (the "GFIC Policy") for the period March 15, 2006 through March 15, 2007.[3] (Doc. 140-2 at 4). The GFIC Policy contains a "limited subsidence exclusion" identical to that contained in the Quanta Policy.[4] (*Id.* at 56).

## 3.   NAS

NAS issued to Amberwood two commercial general liability policies for the period March 15, 2003 through March 15, 2004 and from March 15, 2004 through March

---

[3] Policy number BAG0001014-00. (Doc. 140-2 at 4).

[4] Because this exclusion is identical to the Limited Subsidence Exclusion in the Quanta Policy, the Court will also refer to this exclusion as the Limited Subsidence Exclusion.

15, 2005, respectively.[5] (Doc. 142-2 at 32, 86). Because the policies are identical in the relevant provisions, for convenience the Court refers to them jointly as the "NAS Policy." The NAS Policy contains a "limited subsidence exclusion" identical to that contained in the Quanta Policy and GFIC Policy.[6] (*Id.* at 74, 127).

### B.      Underlying Lawsuits

The coverage dispute in this case arises from five underlying lawsuits filed in Maricopa County Superior Court by homeowners who alleged construction defects in homes that Amberwood had constructed. (Doc. 138 at 3).

#### 1.      *Tritschler*

In 2001, Amberwood purchased the lots at issue in *Tritschler* from another developer. Between 2002 and 2004, Amberwood sold eighteen single-family residences in the Greenfield Estates subdivision of Gilbert, Arizona. The homeowners subsequently sued Amberwood in *Tritschler et al. v. Amberwood Development, Inc., et al.*, Maricopa County Superior Court Case No. CV2008-012745 ("*Tritschler*"). Their complaint alleged defective and defectively installed windows, sliding glass doors, roofs, stucco systems, and drywall systems, in addition to "[c]racked and defectively designed/constructed foundation/slab systems and flatwork for soil conditions, inadequate preparation and compaction of soils, and inadequate drainage." (Doc. 140-7 at 9). The *Tritschler* homeowners sued for breach of implied warranty of workmanship and habitability, breach of express warranty, and breach of contract.

Amberwood tendered the claims to Quanta, who issued a letter on December 24, 2008 reserving its rights and declining, at that time, to acknowledge any obligation to defend or indemnify Amberwood. (Doc. 140-9 at 2). The case subsequently settled, with NAS contributing approximately $1,990,350, Quanta $250,000, and GFIC $0 to indemnification of Amberwood. (Doc. 172-2 at 11). NAS additionally incurred $397,024.29 in defense costs.

---

[5] Policy numbers BXC0004616-00 and BXG0007435-00. (Doc. 142-2 at 32, 86).

[6] The Court will also refer to this exclusion as the Limited Subsidence Exclusion.

2.   *Lawrey*

In 2002, Amberwood purchased the lots at issue from another developer. Between 2003 and 2005, Amberwood sold eight single-family residences in the Sierra Vista II subdivision of Cave Creek, Arizona. The homeowners subsequently sued Amberwood in *Lawrey et al. v. Summerset Marketing Enterprises, Inc. et al.*, Maricopa County Superior Court Case No. CV2009-053228 ("*Lawrey*"). Their complaint alleged soil movement and asserted causes of action for breach of implied warranty, breach of contract, negligent misrepresentation, and negligent misrepresentation per se.

Quanta initially agreed to defend and indemnify Amberwood subject to a reservation of rights.[7] The case settled, with NAS paying $635,350.12 toward indemnifying Amberwood. NAS additionally incurred $222,245.30 in defense costs. (Doc. 172-2 at 11-12). Quanta and GFIC paid nothing.[8]

3.   *Wohlgemuth*

In 2005, Amberwood sold a single-family residence to the Wohlgemuths, who subsequently sued Amberwood in *Wohlgemuth v. Amberwood Development*, Maricopa County Superior Court Case No. CV2011-094354 ("*Wohlgemuth*"). Their complaint alleged:

> i. Improperly engineered soil and expansive soil
>
> ii. Damaged masonry
>
> iii. Cracks in the walls throughout home, caused by foundation movement secondary to improperly engineered soil and expansive soil
>
> iv. Baseboard damage and separation of the baseboards from walls and floors caused by foundation movement secondary to improperly engineered soil and expansive soil

---

[7] Neither Quanta's statement of facts (Doc. 140) nor NAS's response to Quanta's statement of facts (Doc. 172) specify whether Quanta ultimately defended and indemnified Amberwood. Quanta alleges in its motion that it contributed $50,000 toward settlement. (Doc. 138 at 11).

[8] Although Quanta states in its motion that it paid $50,000 toward settlement, it does not support this allegation with a citation to its statement of facts, nor does its statement of facts address what, if any, amount Quanta paid toward this matter. *See* (Doc. 138 at 11).

v. Damage to the garage slabs

vi. Damage to windows and windowsills

vii. Improper grading, causing water to flow towards the foundation and/or the adjacent expansive soil

viii. Failure to install gutters/downspouts to aid in directing water away from the foundation and adjacent soil

(Doc. 140-13 at 35-36). Quanta and GFIC denied coverage. (Doc. 172-2 at 12). The case settled, with NAS paying $24,500 to indemnify Amberwood. NAS additionally incurred $26,711.25 in defense costs. (*Id.*)

**4.** ***Gribble***

In *Gribble*, additional homeowners who had purchased homes from Amberwood in the Sierra Vista II subdivision of Cave Creek, Arizona sued Amberwood in *Gribble et al. v. Summerset Marketing Enterprises et al.*, Maricopa County Superior Court Case No. CV2011-056915 ("*Gribble*"). Their complaint alleged soil movement and claimed for breach of implied warranty, breach of contract, negligent misrepresentation, and negligent misrepresentation per se. *Gribble* remains ongoing. Quanta and GFIC have denied coverage, and NAS has to date incurred $25,759.91 in defense costs. (Doc. 172-2 at 12).

**5.** ***Yu***

In 2003, Amberwood sold a single-family house in Gilbert, Arizona. The homeowners subsequently sued Amberwood in *Yu v. Amberwood Development, Inc.*, Maricopa County Superior Court Case No. CV2012-051082 ("*Yu*"). Their complaint alleged damages caused by "Amberwood's failure to address expansive soils and poor site drainage" at the time of construction, and claimed for the breach of implied warranty of workmanship and habitability. (Doc. 140-28 at 21). Quanta and GFIC denied all coverage; NAS paid $40,000 to settle the suit and incurred $41,568.69 in defense costs.

**IV.   Quanta's Motion for Summary Judgment (Doc. 138)**

Quanta moves for summary judgment on its claim for a declaratory judgment that its policy does not cover the claims against Amberwood as well as for summary judgment

1  on NAS's counterclaims for equitable contribution and indemnity. (Doc. 138 at 2).

2  Quanta argues its policy provided no coverage (and thus it had no duty to indemnify

3  Amberwood) because the underlying lawsuits involved claims for property damages

4  either solely or concurrently caused by soil movement, and therefore these claims were

5  not covered under the Quanta Policy pursuant to the Limited Subsidence Exception. (*Id.*

6  at 3).

7      **A.   Coverage**

8        To succeed on its motion, Quanta must show that as a matter of law Amberwood's

9  losses in the underlying lawsuits are not covered under the Quanta Policy. Quanta argues

10  the Quanta Policy provides no coverage for the claims in the underlying lawsuits because

11  in each of the five complaints, soil movement was alleged as a cause of damages and a

12  geotechnical expert found expansive soil present. (*Id.* at 14).

13        As an initial matter, the Court notes that the Limited Subsidence Exception

14  contains an anti-concurrent causation clause that acts to exclude coverage for soil

15  movement even if another cause contributed to the property damage. *See* (Doc. 140-1 at

16  58) ("Such claims for loss are excluded regardless of any other cause or event

17  contributing concurrently or in any sequence or manner to the loss. . . ."). Thus, the

18  Quanta Policy provides no coverage for property damage caused by soil movement,

19  regardless of whether any concurrent causes, such as faulty construction, contributed to

20  the loss. *See Millar v. State Farm Fire & Cas. Co.*, 804 P.2d 822, 826 (Ariz. Ct. App.

21  1990) (upholding anti-concurrent causation clause); *Cooper v. Am. Family Mut. Ins. Co.*,

22  184 F. Supp. 2d 960, 962 (D. Ariz. 2002) (applying similar mold exclusion and

23  concluding "there is no coverage for losses caused by mold, even though a covered water

24  event may have also contributed to the loss."). However, an anti-concurrent causation

25  clause does not apply when the insured suffers two distinct losses, one of which is caused

26  by the excluded peril and the other is not.[9] *Cf. Corban v. United Servs. Auto. Ass'n*, 20

27

28        [9] For example, if a window in a house cracked solely due to faulty glass and the house also cracked along the foundation due to soil movement, the homeowners could recover for the damaged window (but not the foundation crack). If, however, the soil

So. 3d 601, 616 ¶¶ 43, 47 (Miss. 2009) (holding, narrowly, that a particular "ACC clause applies only if and when covered and excluded perils contemporaneously converge, operating in conjunction, to cause damage resulting in loss to the insured property.").

NAS concedes that the underlying lawsuits involved some damages related to soil movement, but contends that Quanta has not demonstrated that those damages arose out of Amberwood's operations as the Limited Subsidence Exception requires. (Doc. 168 at 6). The Limited Subsidence Exception excludes coverage for soil movement only if "such 'land or soils movement' directly or indirectly emanates from, arises out of, is attributable to, any operations by or performed on behalf of the insured prior to the inception date of this policy."

With respect to the *Tritschler* lawsuit, Quanta fails to prove that the soil movement at issue was caused by "operations by or performed on behalf of [Amberwood] prior to the inception date" of the Quanta Policy, March 15, 2005. Quanta's admissible evidence[10] in support of its motion shows that the properties had grading and drainage issues that were inappropriate for the type of soil and that soil movement had occurred at some of the properties. Specifically, after the *Tritschler* plaintiffs filed their lawsuit, they retained American Geotechnical, Inc. to conduct a geotechnical investigation of the homes at issue.[11] Greg Axten of American Geotechnical, Inc. stated in his deposition that

---

movement had exerted pressure upon the window and faulty glass resulted in the window cracking, the anti-concurrent causation clause would bar recovery for the damaged window.

[10] The Court sustains NAS's objection as to foundation to the Construction Inspection & Testing Company's soil investigation reports (Exhibits 5 & 6) and the State of Arizona's subdivision public report (Exhibit 7) because Quanta has not authenticated the reports and they do not qualify as self-authenticating documents. Similarly, the Court sustains NAS's objection to Quanta's use of the allegations contained in the *Tritschler* complaint (Exhibit 10) as facts. The Court also sustains NAS's objection to the deposition exhibits attached as Exhibit 11. *See Orr*, 285 F.3d at 774 ("A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent.").

[11] Because NAS does not object to the fact that the *Tritschler* plaintiffs retained the geotechnical expert but does properly object to the foundation of the expert's report, which Quanta fails to authenticate, (Doc. 172 at 20), the Court excludes the contents of the report.

1   the grading and drainage at "the subject property"[12] were "pretty flat" and "too flat for an

2   expansive soil site." (Doc. 140-9 at 42:23, 43:16-17). He also stated that the grading and

3   drainage conditions were "not efficient" for "expansive soils where you have significant

4   ground movement potential with moisture changes" and that additional design was

5   required due to the expansive soil. (*Id.* at 43:19-20, 44:17-21).

6       Amberwood retained the Peterson Geotechnical Group, LLC ("Peterson") to

7   perform a geotechnical investigation of the *Tritschler* homes. Peterson concluded that "it

8   is our opinion that soil movement has occurred beneath portions of the eight homes

9   observed." (Doc. 140-10 at 13). At his deposition, Mr. Peterson confirmed that eight

10  homes in the litigation were experiencing soil movement due to expansive soil and

11  moisture infiltration. (Doc. 140-10 at 22-23).

12      This evidence is insufficient to establish the applicability of the Limited

13  Subsidence Exclusion because it does not prove that the soil movement was caused by

14  operations performed by or on behalf of Amberwood. Therefore, Quanta has not

15  established that the claims of the *Tritschler* lawsuit are excluded under the Quanta Policy.

16      With respect to the *Lawrey* lawsuit, Quanta fails to prove that the soil movement

17  at issue was caused by operations performed by or on behalf of Amberwood prior to the

18  the inception date of the Quanta Policy. Quanta's admissible evidence[13] in support of its

19  motion shows that Mr. Pearson, an expert witness, testified at his deposition that soil

20  movement was a cause of movement of the homes and that the grading and drainage

21  appeared to be too flat. (Doc. 140-22 at 4). Mr. Pearson also testified that the building

22  pads beneath the homes appeared to have been constructed several years prior to the

23  construction of the homes but he did not know whether anyone had reworked the pads

24

25      [12] It is unclear from the limited deposition excerpt to which "subject property" the
    deponent was referring, although the excerpt subsequently references "the re-plat of lots
26  5, 6, 27 and 28 and amended the typical lot details of Greenfield Estates[.]" (Doc. 140-9
    at 43:22-25).

27      [13] The Court sustains NAS's objection as to foundation regarding Exhibits 55, 56,
28  57, 58, 59, 61, 62, 63, and 69 attached to Quanta's statement of facts. The Court sustains
    NAS's objection on grounds of incompleteness as to Exhibit 70 because the pages cited
    in paragraph 114 of Quanta's statement of facts are not included.

during that interval. (*Id.* at 7). This evidence is insufficient because it offers no causal connection between soil movement and Amberwood's operations.

Quanta offers no admissible evidence[14] in support of its claim that soil movement at issue in the *Wohlgemuth*, *Gribble*, or *Yu* lawsuits was caused by operations performed by or on behalf of Amberwood.

Quanta separately argues that damages pertaining to seven of the homes in the *Tritschler* lawsuit are additionally excluded under the Quanta Policy's completed operations clause. (Doc. 138 at 15). The Quanta Policy provides for an exclusion for "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'." (Doc. 140-1 at 24, 27). A "completed operations exclusion" endorsement modifies this exclusion by adding the following limitation:

> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor and the structure upon which "your work" was performed meets the following condition:
>
> If you were the seller of a temporary or permanent dwelling unit, the sale of that unit was covered by a fully insured (by a third party) new home warranty that provided all the following coverages and provisions:
>
> - One (1) year of "Workmanship" coverage and Two (2) years of "Systems" coverage all from moment of closing;
>
> - Ten (10) years of "Structural" coverage for "actual physical damage" with coverage beginning at moment of closing;
>
> - Mandatory and binding arbitration as permitted under the Federal Arbitration Act;
>
> - Exclusive remedy provision where permitted by state law.
>
> *        *        *

(*Id.* at 53). But Quanta's sole evidence in support of its argument is a letter from Quanta's

---

[14] The Court sustains NAS's objection as to foundation concerning Exhibits 49, 51, 52, 53, 75, 76, 78, 80, 83, and 86 attached to Quanta's statement of facts.

claim handler to Amberwood that states that "[e]ven though there was a home warranty on the majority of these residences, it appears that the problems alleged by the homeowners were not repaired under the warranty program." [15] (Doc. 140-9 at 2). This evidence is insufficient to prove the applicability of the exclusion.

In sum, Quanta fails to offer sufficient admissible evidence for the Court to conclude as a matter of law that none of the claims in the five underlying lawsuits involved soil movement covered under the Quanta Policy. Accordingly, the Court need not consider NAS's responsive arguments concerning the details of those lawsuits.[16] *See* (Doc. 168 at 6-8).

### B. Equitable Contribution

Quanta argues that NAS can succeed on its counterclaims only if NAS proves that the Quanta Policy covered the losses in the underlying lawsuits. (Doc. 138 at 15). Quanta misstates the law.

The equitable contribution doctrine is based on "'the equitable principle that where two companies insure the same risk and one is compelled to pay the loss, it is entitled to contribution from the other.'" *Nucor Corp. v. Emp'rs Ins. Co. of Wausau*, 296 P.3d 74, 83 ¶ 37 (Ariz. Ct. App. 2012) (quoting *Indus. Indem. Co. v. Beeson*, 647 P.2d 634, 637 (Ariz. Ct. App. 1982)). Arizona courts have established "a four-part test to determine whether an insurer will be required to contribute to another insurer's claim payment. The policies must cover '(1) the same parties, (2) in the same interest, (3) in the same property, [and] (4) against the same casualty.'" *Id.* at 83-84 ¶ 38 (quoting *Granite State Ins. Co. v. Emp'rs Mut. Ins. Co.*, 609 P.2d 90, 93 (Ariz. Ct. App. 1980)).

---

[15] In its reply, (Doc. 188-1 at 3), Quanta contends that its statement of facts cited the wrong exhibit and that it intended to cite Exhibit 23 attached to its statement of facts, a letter from Quanta's third-party claims administrator to Amberwood stating that "[n]one of the eight homes remaining in the Maricopa Superior Court action are or were covered by a new home warranty," (Doc. 140-8 at 40). Because Quanta's correction effectively serves as a new statement of fact to which NAS has not had the opportunity to controvert, the Court will not consider Exhibit 23 as supporting evidence. *See* Fed. R. Civ. P. 56(e)(4).

[16] The Court will address NAS's arguments that as a matter of law Quanta had a duty to indemnify Amberwood in its discussion of NAS's motion for summary judgment.

An insurer's right to contribution exists once the insurer has begun to defend a claim "for which another insurer shares responsibility." *Id.* at 84 ¶ 40. Thus, an insurer who has provided a defense to its insured is entitled to contribution from another insurer who also was obligated to defend the insured, regardless of whether the insurer seeking contribution has yet paid indemnity. *Id.* at ¶¶ 39-40; *Nat'l Indem. Co. v. St. Paul Ins. Cos.*, 724 P.2d 544, 545 (Ariz. 1986). Moreover, the insurer seeking contribution need not have provided a "complete defense." *Nucor*, 296 P.3d at 84 ¶ 41.

Thus, NAS has met the prerequisites for equitable contribution from Quanta and may recover contribution if NAS can prove Quanta had either a duty to indemnify or a duty to defend Amberwood in the underlying actions and NAS insured the same risk. *See id.* at 83 ¶ 37. NAS argues that Quanta and NAS insured the same risk, (Doc. 168 at 4), which Quanta disputes, (Doc. 138 at 16). Quanta contends that it and NAS insured against different interests and different casualties because each insured Amberwood for mutually exclusive time periods. (*Id.*)

Both Quanta and NAS insured Amberwood against the same casualties because both policies insured Amberwood against third-party liability for construction defects and property damage in its work. The interests insured were also identical because Amberwood had an interest in protecting its assets from liability arising out of construction defects and property damage in homes that it constructed. Courts have found the insured interests to differ only where different property interests exist. *See W. Agric. Ins. Co. v. Indus. Indem. Ins. Co.*, 838 P.2d 1353, 1355-56 (Ariz. Ct. App. 1992) (lessor and lessee did not have the same interest in insured premises); *Granite State*, 609 P.2d at 93 (same interest existed where mortgagee was listed as a named insured under one policy and as a mortgage payee under the other); *see also* A.R.S. § 20-1105(B) (defining "insurable interest" in Arizona's insurance statutes).

Although Quanta argues that the insured interest and casualties differ because Amberwood was constructing and developing different projects during different years, Quanta fails to provide a single authority in support of its contention. The fact that a

1    home builder works on different projects does not affect the nature of the interest insured

2    nor the casualty insured against. Quanta's argument is without merit.

3         Because Quanta otherwise satisfies the four-part test for equitable contribution,

4    NAS is entitled to equitable contribution if it can prove that Quanta had a duty to defend

5    or indemnify Amberwood.

6         **C.    Duty to Defend**

7         NAS argues that Quanta owed Amberwood a duty to defend Amberwood in the

8    underlying lawsuits. (Doc. 168 at 8). Quanta does not dispute NAS's argument but

9    instead states, without citation to the record, that Quanta provided a defense to

10   Amberwood and has incurred costs in doing so. (Doc. 188-1 at 7).

11        The Quanta Policy provides:

12             We will pay those sums that the insured becomes legally
               obligated to pay as damages because of "bodily injury" or
13             "property damage" to which this insurance applies. We will
               have the right and duty to defend the insured against any
14             "suit" seeking those damages. However, we will have no duty
               to defend the insured against any "suit" seeking damages for
15             "bodily injury" or "property damage" to which this insurance
               does not apply.
16

17   (Doc. 140-1 at 23). "Suit" is defined, in part, as "a civil proceeding in which damages

18   because of 'bodily injury', 'property damage' or 'personal and advertising injury' to

19   which this insurance applied are alleged." (*Id.* at 37).

20        "[A]n insurer's duty to defend is determined by the language of the insurance

21   policy." *Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 913 P.2d 505, 508 (Ariz. Ct.

22   App. 1996). "[I]f any claim alleged in the complaint is within the policy's coverage, the

23   insurer has a duty to defend the entire suit, because it is impossible to determine the basis

24   upon which the plaintiff will recover (if any) until the action is completed." *Lennar Corp.*

25   *v. Auto-Owners Ins. Co.*, 151 P.3d 538, 544 ¶ 15 (Ariz. Ct. App. 2007) (quoting *W. Cas*

26   *& Sur. Co. v. Int'l Spas of Ariz., Inc.*, 634 P.2d 3, 6 (Ariz. Ct. App. 1981)).

27        Quanta owed Amberwood a duty to defend against all of the underlying lawsuits.

28   Each lawsuit alleged claims that, if true, would be covered under the policy. In *Tritschler*,

the plaintiffs claimed that Amberwood defectively designed and constructed their homes. (Doc. 140-7 at 9). In *Lawrey*, the plaintiffs claimed that Amberwood failed to construct their homes in a workmanlike manner. (Doc. 140-19 at 40). In *Wohlgemuth*, the plaintiffs claimed that Amberwood improperly engineered the soil. (Doc. 140-13 at 35-36). In *Gribble*, the plaintiffs claimed that Amberwood failed to construct their homes in a workmanlike manner considering the expansive soil present. (Doc. 140-27 at 4). In *Yu*, the plaintiffs claimed Amberwood defectively designed and constructed their home for the soil conditions. (Doc. 140-28 at 21). In none of the underlying lawsuits did the plaintiffs limit their claims such that they would clearly fall within the Limited Subsidence Exclusion. The Quanta Policy obligates Quanta to defend Amberwood against claims seeking damages because of property damage to which the Quanta Policy applied. (Doc. 140-1 at 23). Consequently, Quanta owed Amberwood a duty to defend against all of the underlying lawsuits.

### D.    Conclusion

Because Quanta has not shown that the Quanta Policy excludes coverage for the underlying lawsuits, it is not entitled to summary judgment on its claim for a declaratory judgment.[17] For the same reason, Quanta is not entitled to summary judgment on NAS's counterclaim for a declaratory judgment regarding Quanta's duty to indemnify Amberwood. Furthermore, because NAS has met the prerequisites for equitable contribution from Quanta and will be entitled to contribution to the extent the two insurers shared duties to defend or indemnify, Quanta is not entitled to summary judgment on NAS's counterclaims for equitable contribution, equitable subrogation, and equitable indemnity.

### V.    GFIC's Motion for Summary Judgment (Doc. 139)

GFIC moves for summary judgment on all claims, cross-claims, and

---

[17] Quanta argues in its reply that NAS cannot withstand summary judgment using affidavits and evidence that Quanta alleges are improper under the Local Rules of Civil Procedure. (Doc. 188-1 at 8). Because the Court has not relied upon any of NAS's controverting statements of fact in ruling on Quanta's motion, the Court need not reach Quanta's objections.

counterclaims. (Doc. 139 at 1, 18). GFIC, like Quanta, argues that it is entitled to summary judgment because its policy did not cover the claims alleged in the underlying lawsuits against Amberwood. (*Id.* at 7).

### A.   Coverage

GFIC argues that its soil subsidence exclusion (the "GFIC Subsidence Exclusion") excludes coverage for the claims alleged in the underlying lawsuits against Amberwood because the alleged property damage was caused by operations by Amberwood, or performed on its behalf, prior to the inception date of the GFIC Policy. (*Id.* at 8, 10).

GFIC first contends that in each of the underlying lawsuits, the operations by Amberwood or performed on its behalf were completed before the inception date of the GFIC Policy, which was March 15, 2006. (*Id.* at 10). With respect to *Tritschler*, *Lawrey*, *Wohlgemuth*, and *Yu*, all of the homes at issue were sold to the relevant plaintiffs prior to March 15, 2006. (Doc. 140 at 7-8, 17, 22, 32). Accordingly, for these underlying lawsuits, GFIC has established one prong of the GFIC Subsidence Exclusion.

However, because GFIC and Quanta submitted a joint statement of facts in support of their motions for summary judgment, GFIC suffers from the same paucity of admissible evidence that the Court has previously discussed with respect to Quanta's motion. GFIC recites that various contractors performed grading and other soil-related work for Amberwood in each of the underlying lawsuits, but the evidence it cites is inadmissible.[18] *See supra* nn.10, 11, 13, 14. Consequently, GFIC is not entitled to summary judgment on those claims, cross-claims, and counterclaims involving the issue of coverage.[19]

---

[18] In support of its argument, GFIC cites several cases from other jurisdictions in which courts interpreted soil subsidence exclusions to include operations performed by independent contractors. *See, e.g.*, *Blackhawk Corp. v. Gotham Ins. Co.*, 63 Cal. Rptr. 2d 413 (Ct. App. 1997); *Hoang v. Monterra Homes LLC*, 129 P.3d 1028 (Colo. Ct. App. 2005), *reversed on other grounds by Hoang v. Assurance Co. of Am.*, 149 P.3d 798 (Colo. 2007). However, in light of GFIC's failure to provide factual support for its motion, the Court need not discuss these cases.

[19] Because GFIC's evidence in support of its motion is insufficient standing alone to support its motion, the Court need not consider NAS's arguments or evidence in opposition. *See* (Doc. 171 at 12-15). The Court will address NAS's arguments concerning

### B.   Occurrence

GFIC next argues that the property damage at issue in the underlying lawsuits against Amberwood does not constitute an "occurrence" under the GFIC Policy because the property damage stems only from faulty workmanship. (Doc. 139 at 16). The GFIC Policy provides coverage for only "'property damage' caused by an 'occurrence' that takes place in the 'coverage territory'" and defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 140-2 at 21, 34).

Arizona courts have previously addressed the question of whether faulty workmanship resulting in property damage constitutes an "occurrence" as defined in the GFIC Policy. Although "mere faulty workmanship, standing alone, cannot constitute an occurrence," *U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989), faulty work that results in property damage is an occurrence, *Lennar*, 151 P.3d at 545 ¶ 20. Moreover, faulty work that results in property damage is an occurrence even if the damage is "a natural consequence of faulty construction." *Lennar*, 151 P.3d at 546 ¶ 24.

The GFIC Policy's definition of "occurrence" is identical to that at issue in *Lennar*. 151 P.3d at 544 ¶ 15. Moreover, *Lennar* similarly involved a claim for property damaged alleged to result from a combination of faulty workmanship and soil movement. *Id.* at 542-43 ¶ 6. Accordingly, the claims in the underlying lawsuits against Amberwood, if true, constitute claims for property damage caused by an "occurrence" as that term is defined in the GFIC Policy.[20]

---

GFIC's duty to defend in its analysis of NAS's motion for summary judgment.

[20] GFIC cites *Wm C. Vick Constr. Co. v. Penn. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569 (E.D.N.C. 1999) for the proposition that property damage that is the "natural and ordinary consequence" of faulty workmanship does not constitute an "occurrence." (Doc. 139 at 16). But in that case, the court held that faulty workmanship did not constitute an "occurrence" because the claims "were based solely on the costs of repairing [the] allegedly faulty workmanship." 52 F. Supp. 2d at 586. Therefore, *Wm C. Vick Construction* is distinguishable. Moreover, the court in that case applied North Carolina law, and Arizona law is clear that property damage that is "a natural consequence of faulty construction" constitutes an "occurrence." *Lennar*, 151 P.3d at 546

### C.     Tender in *Tritschler*

GFIC argues that NAS is not entitled to equitable contribution from GFIC for the claims in the *Tritschler* lawsuit because an insurer is liable for equitable contribution only if it owed a duty to defend or indemnify its insured for the claim at issue. (Doc. 139 at 2-3). According to GFIC, because Amberwood never tendered the *Tritschler* claim, GFIC had no duty to defend or indemnify Amberwood and thus NAS is not entitled to equitable contribution from GFIC. (*Id.* at 2-4). NAS does not dispute that between an insured and its insurer, the insurer's duties to defend and indemnify arise only after a tender by the insured to the insurer; however, NAS contends that a different rule applies in the equitable contribution context. NAS argues that regardless of whether Amberwood tendered to GFIC, GFIC's constructive notice of the *Tritschler* lawsuit is sufficient to entitle NAS to equitable contribution from GFIC. (Doc. 171 at 4).

### 1.      Legal Standard

The parties do not cite, and the Court has not found, any reported decision by an Arizona court addressing whether an insurer's entitlement to equitable contribution depends upon a tender from the insured to the insurer from whom contribution is sought. Accordingly, the Court "must use its own best judgment in predicting how the state's highest court would decide the case." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980). "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." *Id.*

It is undisputed that in the context of a coverage dispute between an insured and its insurer, an insurer has no duty to defend until the insured tenders the claim to the insurer. *See Purvis v. Hartford Accident & Indem. Co.*, 877 P.2d 827, 831 (Ariz. Ct. App. 1994). A valid tender requires a notice imparting the insurer with "knowledge that the suit is potentially within the policy's coverage coupled with knowledge that the insurer's assistance is desired." *Id.* (quoting *Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985)); *see also Litton Sys., Inc. v. Shaw's Sales & Serv., Ltd.*,

---

¶ 24.

579 P.2d 48, 52 (Ariz. Ct. App. 1978).

The parties dispute, however, whether tender by the insured to the insurer controls the entitlement of another insurer to contribution. Some Arizona decisions have couched the equitable contribution doctrine in language that implies it is contingent upon the insured's rights against the insurer from whom contribution is sought. In *Western Agricultural*, the court held that an insurer who has paid a claim may seek equitable contribution "directly from other carriers who are liable for the same loss." *W. Agric. Ins.*, 838 P.2d at 1355; *see also St. Paul Fire & Marine Ins. Co. v. Allstate Ins. Co.*, 543 P.2d 147, 149-50 (Ariz. Ct. App. 1975). GFIC applies this language to conclude that Amberwood's failure to tender the *Tritschler* claims to GFIC precluded GFIC from being the subject of equitable contribution. (Doc. 139 at 3-4).

However, not all Arizona decisions join *Western Agricultural* in describing an insurer's responsibility for equitable contribution in terms of whether it was liable for "the same loss." Other cases focus on whether the insurer who seeks contribution was "compelled to pay the loss." *See Nucor*, 296 P.3d at 83 ¶ 37 ("The claim was based on 'the equitable principle that where two companies insure the same risk and one is compelled to pay the loss, it is entitled to contribution from the other.'" (quoting *Indus. Indem. Co. v. Beeson*, 647 P.2d 634, 637 (Ariz. Ct. App. 1982)); *Indus Indem Co.*, 647 P.2d at 637 (quoting *Universal Underwriters Ins. Co. v. Dairyland Mut. Ins. Co.*, 433 P.2d 966 (Ariz. 1967), *overruled in part by Hartford Acc. & Indem. Co. v. Aetna Cas. & Sur. Co.*, 792 P.2d 749 (1990)). This language emphasizes the duty of the insurer seeking contribution to pay the claim as well as the shared duty of both insurers to provide coverage for the claim, and does not appear to require that the insurer from whom contribution is sought has previously received a valid tender from the insured.

Nevertheless, the Court concludes that the Arizona Supreme Court, were it to decide this issue, would follow the language of *Western Agricultural* and conclude that an insurer may recover under equitable contribution from only those insurers to whom the insured has tendered the claims at issue. A right to equitable contribution "arises

when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal. Rptr. 2d 296, 303 (Ct. App. 1998). It thus follows that an insurer cannot be obligated to pay another insurer unless it has incurred a duty to defend or indemnify the insured. This is despite the fact that equitable contribution "is not derivative from any third person, but exists as an independent action by one insurer against another under principles of equity." *Indus. Indem.*, 647 P.2d at 639; *see also Am. Cont'l Ins. Co. v. Am. Cas. Co. of Reading, Pa.*, 903 P.2d 609, 610 (Ariz. Ct. App. 1995); *Fireman's Fund*, 77 Cal. Rptr. 2d at 303-04 ("Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured."). The independence of a right of equitable contribution from the insured's rights should not serve as grounds for an insurer's liability when the insurer could not be liable to the insured for the same claim.

NAS argues, however, that the Court should follow *OneBeacon America Insurance Co. v. Fireman's Fund Insurance Co.*, 95 Cal. Rptr. 3d 808 (Ct. App. 2009), in which the California Court of Appeal held that a "formal tender by the insured is not required in an action between insurers for equitable contribution." 95 Cal. Rptr. 3d at 826. NAS urges the Court to adopt the constructive notice standard of *OneBeacon* that "an insurer's obligation of equitable contribution for defense costs arises where, after notice of litigation, a diligent inquiry by the insurer would reveal the potential exposure to a claim for equitable contribution, thus providing the insurer the opportunity for investigation and participation in the defense in the underlying litigation." *Id.* at 827. But *OneBeacon* was the product of California's tender standard, under which the duty to defend "may arise upon receipt of 'constructive notice' of the contractual duty to defend." *Id.* at 821. NAS is mistaken in citing *OneBeacon* for the proposition that California adopted constructive notice only in the context of equitable contribution. *See*

1   (Doc. 171 at 4).

2          Each of the other cases to which NAS cites in support of its constructive notice

3   standard also involved an underlying standard for tender from an insured to its insurer

4   that differ from the standard under Arizona law. *See Home Ins. Co. v. Nat'l Union Fire*

5   *Ins. of Pittsburgh*, 658 N.W.2d 522, 532-33 (Minn. 2003) (tender requires only notice of

6   a claim); *White Mountain Cable Constr. Co. v. Transamerica Ins. Co.*, 631 A.2d 907,

7   9190 (N.H. 1993) (same); *Towne Realty, Inc. v. Zurich Ins. Co.*, 548 N.W.2d 64, 67 (Wis.

8   1996) (same). Thus, although NAS is correct that "virtually all states that have directly

9   addressed what constitutes sufficient notice in the specific context of an equitable

10  contribution action" have adopted the constructive notice standard, (Doc. 171 at 4), these

11  states have done so only because they had previously adopted a constructive notice

12  standard for tender between an insured and insurer.

13         Unlike in California and other states, tender under Arizona law requires more than

14  mere notice of the claim. The insured must impart notice both of the claim as well as

15  inform the insurer that its assistance is desired. *Purvis*, 877 P.2d at 831. The fact that

16  recovery for equitable contribution is an independent action not derivative of the

17  insured's rights does not require a lesser standard for tender than that required of an

18  insured. Accordingly, the Court concludes that NAS's recovery for equitable contribution

19  from GFIC regarding *Tritschler* requires NAS to demonstrate that GFIC received notice

20  imparting it with knowledge of the claims as well as knowledge that its assistance was

21  desired.[21]

22                              **2.     Analysis**

23         GFIC contends the evidence shows that it was not tendered the *Tritschler* claims

24  until after the cases settled. (Doc. 139 at 4). The *Tritschler* claims were filed on May 30,

25  2008; some plaintiffs settled on November 13, 2010 and the remainder on July 27, 2011.

26  _____

27         [21] Because the Court finds no justification for restricting the tenderer to the
    insured, either Amberwood, Quanta, or NAS could tender the *Tritschler* claims to GFIC.
28  *See OneBeacon*, 95 Cal. Rptr. 3d at 823 (crafting the tender standard to focus on the
    insurer's receipt of notice rather than on the identity of the sender).

(Doc. 140-7 at 6; Doc. 140-10 at 40; Doc. 140-11 at 2). In support, GFIC offers the affidavits of its current and prior claims administrators, both of whom attest that their practice was to open claims files upon receipt of a tender and that no claims files for the *Tritschler* matter existed prior to its settlement. (Doc. 140-7 at 32-33; Doc. 140-8 at 3-4). NAS disputes these affidavits by implying that GFIC may have had additional claims administrators who received a tender. (Doc. 172 at 26). But NAS does not point to any evidence showing that GFIC had additional claims administrators. NAS asserts that the earliest involvement of Network Adjusters, GFIC's previous claims administrator, was August 2009. (*Id.*) Its authority for this statement is an e-mail chain dated August 2009 involving Network Administrators; this does not support the proposition that Network Adjusters *became* GFIC's claims administrator in August 2009. (Doc. 189-1 at 2).

NAS also contends that GFIC has failed to provide evidence of the identity of its claims adjusters at the time *Tritschler* was pending. (Doc. 171 at 10-11). NAS requests the Court to, pursuant to Federal Rule of Civil Procedure ("Rule") 37, provide NAS with an adverse inference regarding GFIC's notice of *Tritschler*. (*Id.* at 9). NAS cites several cases for the proposition that willful refusal to comply with discovery is grounds for Rule 37 sanctions. (Doc. 171 at 9). However, none of these cases support the imposition of sanctions in this case and to the contrary, each of them involves distinguishable facts. For example, *Akinoa v. United States*, 938 F.2d 158 (9th Cir. 1991) stands for the proposition that an adverse inference may be drawn "from the *destruction* of evidence relevant to a case." 938 F.2d at 160-61. NAS does not allege that GFIC has destroyed evidence, refused to attend a deposition, or refused to comply with a court order to produce documents. *See, e.g.*, *Liss v. Exel Transp. Servs., Inc.*, 2008 WL 370886, at *3-4 (D. Ariz. Feb. 11, 2008) (party refused to produce documents). Rather, NAS simply believes that GFIC is withholding discoverable evidence, for which the proper remedy was to request sanctions during the discovery period. NAS's unsupported suspicions are an insufficient basis for Rule 37 sanctions.

GFIC additionally attempts to prove that it was not tendered *Tritschler* by pointing

to tender letters from Amberwood to other insurers and inferring from the absence of a disclosed letter to GFIC that no tender occurred. (Doc. 139 at 4). GFIC also offers an e-mail from Amberwood's counsel dated April 17, 2008 and containing a "carrier matrix" listing all of Amberwood's insurers. (Doc. 140-8 at 6-7). GFIC is not listed. (Id. at 7). Although NAS is correct that this evidence, along with others,[22] does not prove a failure to tender, the difficulty of proving a negative means that to prevail on this issue, NAS must make a positive proof by offering controverting facts showing that tender occurred.

NAS offers an entry in Quanta's claim notes dated April 2, 2008 which states, in relevant part: "I have reviewed this with NAS and the adjuster for GFIC which is Crawford and co. wer [sic] all agree to work on this matter together." (Doc. 189-4 at 3). NAS argues this note shows that GFIC was tendered the *Tritschler* claims. (Doc. 171 at 6-7). GFIC responds that the note is erroneous because Crawford was the claims adjuster for North American Capacity Insurance Company ("NAC"), not GFIC, and although NAC was tendered the claims, GFIC was not. (Doc. 184 at 6). GFIC also offers evidence that Crawford was involved in the *Tritschler* matter on behalf of NAC. (Doc. 140-8 at 15).

The Court cannot weigh the evidence on a motion for summary judgment. *See Anderson*, 477 U.S. at 249. Although the bulk of the evidence shows GFIC was not tendered the *Tritschler* claims, the claim note creates a genuine issue of material fact as to whether tender was made to GFIC.[23] A jury must make this determination. Accordingly,

---

[22] GFIC offers other evidence concerning the lack of tender, including Exhibits 33 and 35 attached to its joint statement of facts in support of its motion for summary judgment.

[23] GFIC argues that the Court may not consider the claim note in ruling on GFIC's motion for summary judgment because it is inadmissible hearsay. (Doc. 185 at 7-8). As the Court has previously explained, hearsay may be considered in opposition to a motion for summary judgment. *See Fraser*, 342 F.3d at 1036-37.

GFIC also contends that NAS's Controverting Statement of Facts should be stricken because it improperly incorporates argument in violation of Local Rule of Civil Procedure ("Local Rule") 7.2(m)(2). (Doc. 185 at 9 n.19). Although NAS's Controverting Statement of Facts (Doc. 172) violates Local Rule 7.2(m)(2) because some of NAS's responses include argument, GFIC does not contend that NAS's Separate Statement of Facts in Support of Motion for Summary Judgment (Doc. 142), to which

- 26 -

1    the Court cannot conclude as a matter of law that GFIC was not tendered the *Tritschler*

2    claims.[24]

3          **D.    NAS's Claim for Damages**

4          GFIC argues that NAS's claim for equitable contribution against GFIC fails

5    because NAS has not provided sufficient evidence supporting its damages. (Doc. 139 at

6    16-17). First, GFIC contends that NAS has not specified a reasonably certain amount of

7    damages because it has estimated its damages as "at least $2,157,933.49, but more likely

8    as much as $2,700,000.00." (Doc. 172-2 at 5). Although damages cannot be "speculative,

9    remote or uncertain," a party need not prove the amount of damages with as much

10   certainty as it must prove the existence of damages. Coury Bros. Ranches, Inc. v.

11   Ellsworth, 446 P.2d 458, 464 (Ariz. 1968). GFIC errs in relying upon *Gilmore v. Cohen*,

12   386 P.2d 81 (Ariz. 1963) to argue to the contrary. The court in *Gilmore* concluded proof

13   of damages was too speculative when plaintiffs admitted *at trial* that they did not know

14   the amount of lost profits they had incurred. 386 P.2d at 83.

15         Here, NAS's Second Supplemental Disclosure Statement lists the amounts NAS

16   has expended in defending and indemnifying Amberwood in the underlying lawsuits.

17   (Doc. 140-13 at 2-5). It also disclosed itemized spreadsheets listing the payments made

18   on each lawsuit. (*Id.* at 7-26). This evidence was sufficiently certain to prove the

19   existence and amount of damages. Nevertheless, GFIC challenges these spreadsheets as

20   insufficient because they are unauthenticated and also not the "best evidence of NAS'ss

21   claims." (Doc. 139 at 17-18).

22         GFIC misreads *Orr v. Bank of America* as holding that unauthenticated documents

23   "are not sufficient to overcome summary judgment." (Doc. 139 at 17). Although *Orr* held

24   ────────────────────────────

25   NAS cites in showing the contents of the claim note, violates Local Rule 7.2.
     Consequently, GFIC fails to show that NAS's offer of the claim note is improper. The
26   Court also notes that GFIC's Controverting Statement of Facts itself improperly contains
     argument in response to NAS's offer of the claim note. (Doc. 170 at 23-24).

27        [24] NAS argues that even if GFIC was not tendered the *Tritschler* claims, GFIC is
     only not liable for coverage if it can prove it was prejudiced by the failure to tender.
28   (Doc. 171 at 8). Because this argument depends upon the jury's finding as to whether
     tender occurred, the Court declines to issue an advisory opinion on this issue.

that the non-movant's exhibits were inadmissible for purposes of opposing a motion for summary judgment, 285 F.3d at 773, the Ninth Circuit Court of Appeals later clarified in *Fraser v. Goodale* that it is the admissibility of the contents of evidence, not its form, that determines whether evidence is admissible for purposes of avoiding summary judgment. 342 F.3d at 1036-37. The fact that the spreadsheets are unauthenticated does not bar their admissibility for the limited purpose of opposing GFIC's motion.

The spreadsheets also do not violate the best evidence rule, which requires an "original" writing "unless these rules . . . provide[] otherwise." Fed.R.Evid. 1002. "For electronically stored information 'original' means any printout—or other output readable by sight—if it accurately reflects the information." Fed.R.Evid. 1001(d). The form of the disclosed spreadsheets, as a printout of electronically stored information, does not violate these rules.

GFIC additionally contends that NAS cannot prove damages because NAS has failed to state the theory upon which it seeks to allocate damages among insurers. (Doc. 139 at 17). There are numerous methods for allocating costs of defense among multiple primary insurers, and the method used presumably affects the amount NAS seeks from GFIC. *See Regal Homes, Inc. v. CNA Ins.*, 171 P.3d 610, 620 ¶ 43 & n.8 (Ariz. Ct. App. 2007). Rule 26(a)(1)(A)(iii) requires a party to disclose "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying . . . the documents . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." However, if NAS's failure to disclose the allocation theory or theories upon which it seeks to recover is harmless, the Court need not forbid NAS from picking a particular allocation theory at trial. *See* Fed. R. Civ. P. 37(c)(1); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008).

NAS asserts that it has "made clear in numerous communications with GFIC" that it seeks to recover from GFIC and Quanta under the "time on risk" method of allocation, but does not support this assertion with a citation to evidence. (Doc. 172 at 19).

Nevertheless, even assuming NAS had not previously disclosed its method of allocation, the Court concludes any failure to disclose was harmless. The existence of damages stems from the amounts NAS paid to defend and indemnify Amberwood; the theory of allocation controls only the amount of damages NAS seeks from GFIC (and Quanta). Furthermore, the theory of allocation does not affect the issues of duties to defend and indemnify, tender, and equitable contribution. Rather, if NAS establishes that GFIC or Quanta had a duty to defend or indemnify Amberwood and also that NAS is entitled to equitable contribution, the theory of allocation determines only the dollar amount of damages that NAS seeks to recover. Consequently, even if NAS has not disclosed its theory of allocation, any such violation of Rule 26 is harmless and the Court will not bar NAS from now asserting the time-on-risk theory.[25]

## VI.    NAS's Motion for Summary Judgment (Doc. 141)

NAS asks the Court for summary judgment declaring that Quanta and GFIC had duties to defend and indemnify Amberwood in the underlying lawsuits as well as an order stating that NAS is entitled to equitable contribution. (Doc. 141 at 6).

### A.    Duty to Defend

NAS argues that Quanta and GFIC had duties to defend Amberwood in each of the underlying lawsuits because the claims as alleged were within the scope of the policy. (Doc. 141 at 7). As in its reply in support of its motion to dismiss, Quanta does not dispute NAS's argument but offers the unsupported statement that it has incurred defense costs and satisfied its obligations under Arizona law. (Doc. 173 at 11). Because the Court has already concluded that Quanta owed Amberwood a duty to defend against all of the underlying lawsuits, *see supra* IV.C, the Court will not repeat that analysis. Quanta owed

---

[25] Thus, the Court need not address GFIC's argument that NAS improperly offers evidence in support of its motion for summary judgment. *See* (Doc. 185 at 12 n.32).

Additionally, GFIC argues that NAS cannot establish on its equitable contribution claim that it paid more than its share of defense and indemnity costs. (Doc. 185 at 12). Because Quanta and GFIC did not contribute to the cost of indemnifying Amberwood in the underlying lawsuits, this fact suffices to establish that NAS, if entitled to equitable contribution for both defense and indemnity costs, has suffered damages.

Amberwood a duty to defend it against all of the underlying lawsuits.

GFIC argues, however, that because the claims in the underlying lawsuits fall within the scope of the Limited Subsidence Exclusion and there is no "possibility of coverage," it had no duty to defend. (Doc. 169 at 3). The GFIC Policy defines a scope of the duty to defend identical to that of the Quanta Policy. (Doc. 140-2 at 21; Doc. 140-1 at 23). Although GFIC launches into a lengthy argument as to why the GFIC Policy does not cover the claims against Amberwood, (Doc. 169 at 9), GFIC confuses the duty to defend with the duty to indemnify; the duty to defend is defined by the claims alleged in the complaint, regardless of whether those claims are ultimately meritorious. *See Lennar*, 151 P.3d at 544 ¶ 15. Because the GFIC Policy and the Quanta Policy are identical in their scope of the duty to defend, for the reasons the Court has discussed with respect to Quanta, *see supra* IV.C, GFIC had a duty to defend Amberwood against all of the underlying lawsuits.[26]

## B.     Duty to Indemnify

NAS argues that in addition to the duty to defend, Quanta and GFIC both owed Amberwood the duty to indemnify it from the claims in the underlying lawsuits. (Doc. 141 at 12). NAS first contends that the Limited Subsidence Exclusion is inapplicable to the claims in the underlying lawsuits because "there is no evidence that Amberwood performed soils work on any of the homes at issue." (Doc. 141 at 12).

Quanta and GFIC assert that NAS misinterprets the Limited Subsidence Exclusion by applying a narrower meaning than its plain language suggests. (Doc. 169 at 10; Doc. 173 at 3-4). They point out, correctly, that the exclusion encompasses the operations of Amberwood's subcontractors, not just those of Amberwood itself. (*Id.*) The exclusion applies, in relevant part, to "any operations by or performed on behalf of the insured." Thus, Amberwood need not have performed soil operations itself for the exclusion to

---

[26] GFIC raises the argument in its response that NAS may not seek equitable contribution based upon the *Gribble* lawsuit because NAS never alleged the claim. (Doc. 169 at 2). However, NAS's answer, counterclaim, and cross-claim allege *Gribble* as a basis for equitable contribution. (Doc. 37 at 13, 15).

1    apply; it is sufficient that Amberwood hired a subcontractor who performed the work on

2    behalf of Amberwood. *See Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d

3    648, 652 (9th Cir. 1988) (phrase "on behalf of" referred to subcontractors).

4         Quanta and GFIC are also correct that the Limited Subsidence Exclusion applies

5    to "any operations" performed by or on behalf of Amberwood. By its own terms, the

6    exclusion applies when Amberwood has performed "any operations." There is no

7    limitation to only "soil operations."

8         As evidence that Amberwood never performed *soil* operations on the lots at issue,

9    NAS offers the affidavit of Megan Johnson, Amberwood's President, who testified that in

10   all of the underlying lawsuits, Amberwood "commenced construction" on lots in

11   "prefinished condition, including finished pads if required by the municipalities" and the

12   lots had already been "inspected and certified by the applicable municipal inspection

13   offices with respect to both soil compaction and pad approval before Amberwood

14   commenced construction."[27] (Doc. 140-2 at 20-21). She also states that she is unaware of

15   any "soil compaction operations" "performed by Amberwood," but that "[t]o the extent

16   Amberwood may have been required . . . to perform additional ancillary soil work as a

17   condition of obtaining a building permit for construction on the prefinished lots," she is

18   unaware of such work causing damages. (*Id.*)

19        Johnson's affidavit itself raises the possibility that Amberwood performed soil

20   work. (*Id.*). Although Quanta and GFIC bear the burden of establishing a genuine issue of

21   material fact as to whether Amberwood or its subcontractors performed operations on the

22   lot, and they offer scant admissible evidence on this issue,[28] the Court must not grant

23

24        [27] Quanta and GFIC object to this affidavit as being untimely disclosed. The Court
     cannot say on this record whether Megan Johnson's testimony was timely disclosed, and
25   the Court overrules the objection without prejudice to raising it at a later date.

26        [28] Quanta and GFIC cite to allegations in the underlying third-party complaints
     against Amberwood as evidence that various subcontractors of Amberwood performed
27   landscaping or grading work. *See, e.g.*, (Doc. 173 at 4). Evidence in opposition to a
     motion for summary judgment need not be admissible in content, only in form. *See Tetra*
28   *Techs.*, 823 F. Supp. at 1120. However, the allegations of a complaint are not admissible
     evidence to prove the truth of those allegations because the drafter of a non-verified
     complaint has no personal knowledge of the facts alleged. *Cf. Lopez v. Smith*, 203 F.3d

summary judgment if unsupported by the moving papers. *See Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003). Johnson testifies that she is unaware of soil operations by Amberwood, but then states that if any occurred, she is unaware of damages resulting from their occurrence. It is also troubling that Johnson's testimony addresses *soil* operations yet the Limited Subsidence Exclusion encompasses *any* operations. For example, if Amberwood conducted non-soil operations causing soil subsidence, such operations would fall within the scope of the Limited Subsidence Exclusion. Johnson's affidavit does not address such non-soil operations, and as such, fails to show that NAS is entitled to summary judgment with respect to this issue.

NAS also asserts that rainwater, and not operations performed by Amberwood, was the sole cause of the soil subsidence in the properties at issue. (Doc. 141 at 13). NAS attached to its motion for summary judgment affidavits of expert witnesses who testify that rainwater was a cause of the soil subsidence. Quanta and GFIC object to these affidavits as untimely disclosed sham affidavits. (Doc. 169 at 16; Doc. 173 at 10). The Court need not consider Quanta's and GFIC's objections because even accepting the affidavits as true and properly disclosed, they inadequately support NAS's motion.

Thomas Irwin, a structural engineer, testified in his affidavit that "naturally occurring rainwater cannot reasonably or reliably be excluded as a cause of the soils movement" even if the grading and drainage at the homes had been proper. (Doc. 142-9 at 68). Similarly, Philip Coppola testified that rainwater would have caused damages to the homes even if the grading and drainage had been proper. (Doc. 142-10 at 5). Mr. Coppola also stated that "the soil movement at the homes were [sic] not substantially caused by moisture from sources other than rain water." (*Id.*). But the Limited Subsidence Exception contains an anti-concurrent causation clause excluding coverage for soil movement caused by Amberwood's operations, even if rainwater penetration was also a cause of the movement. *See supra* IV.A. The affidavits of Irwin and Coppola do

---

1122, 1132 n.14 (9th Cir. 2000) ("A plaintiff's verified complaint may be considered as an affidavit *in opposition to summary judgment* if it is based on personal knowledge and sets forth specific facts admissible in evidence." (emphasis added)).

not exclude Amberwood's operations as a cause of soil movement and are not probative as to whether Amberwood performed operations on the homes at issue.

NAS also argues that the Limited Subsidence Exclusion does not apply to Amberwood's failure to perform necessary soil operations because the exclusion does not explicitly state that it applies to a failure to perform operations, only to operations performed. (Doc. 141 at 13). NAS identifies five instances in the Quanta Policy and the GFIC Policy where the terms of the policies explicitly address both acts and failures to act; it concludes from these that the policy drafters intentionally excluded failures to act from the scope of the Limited Subsidence Exclusion. (*Id.* at 13-14). The Court declines to address this argument because its merit, even if correct, depends upon a prior finding that Amberwood did not perform any operations on the homes at issue. For the reasons previously stated, NAS has failed to make this showing.

Finally, NAS contends that Quanta and GFIC are unable to prove that the damages claimed in the underlying lawsuits were caused by soil movement. (*Id.* at 15). The Court cannot make this statement on the present record. First, NAS misstates the law when it claims that "an uncovered, concurrent cause of harm does not defeat coverage if there is a separate, covered cause of harm." (*Id.*) (citing *Scottsdale Ins. Co. v. Van Nguyen*, 763 P.2d 540, 542 (Ariz. Ct. App. 1988)). Because the Limited Subsidence Exclusion contains an anti-concurrent causation clause, an uncovered, concurrent cause of harm *does* defeat coverage if there is a separate, covered cause of harm. *See Millar*, 804 P.2d at 826. Of course, if NAS can prove that damages were wholly distinct in causation such that some damages were caused solely by soil movement and others were caused solely by a different, non-soil related cause, then Quanta and GFIC may have a duty to indemnify Amberwood for the latter. *Cf. Corban*, 20 So. 3d at 616 ¶¶ 43, 47.

With respect to each of the underlying lawsuits, Quanta and GFIC have established a disputed issue of fact as to which, if any, damages are within the scope of the Limited Subsidence Exclusion. With respect to *Tritschler*, NAS attaches an affidavit of an expert who testifies that 85% of the damages are unrelated to soil movement. (Doc.

142-7 at 7). Quanta and GFIC offer expert reports that identify soil movement as the cause of the same kinds of damages (namely, cracks and separation). (Doc. 140-9 at 21; Doc. 140-10 at 13). With respect to *Lawrey, Gribble, and Wohlgemuth*, NAS repeats its arguments that Amberwood did not perform any operations on the soil causing damages; for the reasons previously discussed, these arguments fail. And with respect to *Yu*, Quanta and GFIC offer an expert report identifying soil movement as the cause of damages and improper soil compaction as a likely contributory factor. (Doc. 140-29 at 9).

Consequently, NAS has not shown there is no genuine issue of material fact whether Quanta and GFIC owed Amberwood a duty to indemnify against the claims in the underlying lawsuits.

## VII.   Conclusion

### A.    Legal Prerequisites for Equitable Contribution

NAS has established the prerequisites to equitable contribution from Quanta and GFIC by showing as a matter of law that under the four-part Arizona test, all three insurers insured the same risk. NAS has shown as a matter of law that Quanta owed Amberwood a duty to defend against all of the underlying lawsuits. NAS is entitled to equitable contribution from Quanta for costs incurred in defending Amberwood in an amount to be determined at trial.

#### 1.    Duty to Defend

NAS has shown as a matter of law that GFIC owed Amberwood a duty to defend against the *Lawrey*, *Wohlgemuth*, *Gribble*, and *Yu* underlying lawsuits. A question of fact remains as to whether GFIC owed Amberwood a duty to defend against the *Tritschler* lawsuit. NAS is entitled to equitable contribution from GFIC for costs incurring in defending Amberwood against the *Lawrey*, *Wohlgemuth*, *Gribble*, and *Yu* underlying lawsuits. If NAS proves at trial that GFIC owed Amberwood a duty to defend against the *Tritschler* lawsuit, then NAS will also be entitled to equitable contribution from GFIC for costs incurring in defending Amberwood against *Tritschler*, in an amount to be determined at trial.

1

### 2.    Duty to Indemnify

2    Regarding the duty to indemnify, a question of fact remains as to whether Quanta

3 or GFIC owed Amberwood a duty to indemnify against the liabilities Amberwood

4 incurred in the underlying lawsuits. There is also a question of fact as to the proper

5 amount of any equitable contribution owed to NAS based upon a duty to indemnify. NAS

6 must prove at trial that Quanta or GFIC owed Amberwood a duty to indemnify

7 Amberwood against the underlying lawsuits. If NAS meets its burden of proof at trial,

8 then it will be entitled to equitable contribution for the liabilities Amberwood incurred in

9 the underlying lawsuits, in an amount to be determined at trial, against either Quanta or

10 GFIC or both.

11

### B.    Attorneys' Fees and Costs

12    At this stage of the litigation, the Court declines to award any costs or attorneys'

13 fees because the outcome at trial will determine which party or parties, if any, are the

14 prevailing party under A.R.S. § 12-341.01.

15    For the foregoing reasons,

16 / / /

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1    **IT IS ORDERED** denying Quanta Indemnity Company's Motion for Summary
2    Judgment (Doc. 138).

3    **IT IS FURTHER ORDERED** denying Defendant General Fidelity Insurance
4    Company's Motion for Summary Judgment (Doc. 139).

5    **IT IS FURTHER ORDERED** granting in part and denying in part North
6    American Specialty's Motion for Summary Judgment (Doc. 141).

7    **IT IS FURTHER ORDERED** denying without prejudice Quanta's request for
8    costs and attorneys' fees.

9    Dated this 26th day of March, 2014.

10

11

12

13                                    James A. Teilborg
                                      Senior United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28